IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMUEL CLAYTON, Jr., M.D., | : | No.  4:CV 05-0768 |
| | : | |
| Plaintiff, | : | Judge Jones |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA DEPARTMENT OF | : | |
| PUBLIC WELFARE, by and through | : | |
| their agent ESTELLE RICHMAN, | : | |
| Secretary Department of Public Welfare, | : | |
| at HARRISBURG STATE HOSPITAL | : | |
| by and through their agent, DR. ANN | : | |
| SHEMO, Medical Director, PA Department | : | |
| of Public Welfare, Harrisburg State | : | |
| Hospital, | : | |
| Defendants | : | |

## MEMORANDUM

### February 20, 2007

## THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:

Pending before the Court is Defendants', Pennsylvania Department of Public

Welfare, Estelle Richman and Dr. Ann Shemo, Motion for Summary Judgment

("the Motion") (doc. 36) filed on October 6, 2006.

For the following reasons, the Motion (doc. 36) will be granted.

## PROCEDURAL HISTORY:

Plaintiff Samuel Clayton, Jr., M.D.("Plaintiff" or "Clayton") commenced

this action by filing a complaint (doc. 1) on April 15, 2005.  Thereafter on April 22, 2005, Plaintiff filed an amended complaint (doc. 3), to which Defendant filed an answer (doc. 16) on July 6, 2005.

In Count I of the complaint, Plaintiff claims that he was discriminated against on the basis of his race in violation of 42 U.S.C. § 1981.  In Count II of the complaint, Plaintiff claims he was discriminated against on the basis of his race as well as retaliated against for his complaints of discriminatory treatment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2001 et seq.  In Count III of the complaint, Plaintiff claims he was discriminated and retaliated against in violation of the Pennsylvania Human Relations Act, 43 Pa. C. S. § 951 et seq.  In Count IV of the complaint, Plaintiff claims that he was retaliated against as a consequence of his internal and EEOC complaints, in violation of §1981.   In the prayer for relief, Plaintiff seeks judgment for back pay, lost compensation, attorney fees and monetary relief, plus costs and interest.

 Following the close of discovery, the Defendants filed the instant Motion, which was fully briefed by the parties.  The Motion is therefore ripe for our review.

**STANDARD OF REVIEW:**

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."

2

FED .R. CIV .P.  56(c); <u>see</u> <u>also</u> <u>Turner v. Schering-Plough Corp.</u>, 901 F.2d 335,

340 (3d Cir. 1990).  The party moving for summary judgment bears the burden of

showing "there is no genuine issue for trial."  <u>Young v. Quinlan</u>, 960 F.2d 351,357

(3d Cir. 1992).  Summary judgment should not be granted when there is a

disagreement about the facts or the proper inferences which a fact finder could

draw from them.  <u>See</u> <u>Peterson v. Lehigh Valley Dist. Council</u>, 676 F.2d 81, 84 (3d

Cir. 1982).

Initially, the moving party has a burden of demonstrating the absence of a

genuine issue of material fact.  <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 323

(1986).  This may be met by the moving party pointing out to the court that there is

an absence of evidence to support an essential element as to which the non-moving

party will bear the burden of proof at trial.  <u>Id</u>. at 325.

Federal Rule of Civil Procedure 56 provides that, where such a motion is

made and properly supported, the non-moving party must then show by affidavits,

pleadings, depositions, answers to interrogatories, and admissions on file, that

there is a genuine issue for trial.  Fed.R.Civ.P. 56(e).  The United States Supreme

Court has commented that this requirement is tantamount to the non-moving party

making a sufficient showing as to the essential elements of their case that a

reasonable jury could find in its favor.  <u>Celotex Corp.</u>, 477 U.S. at 322-23.

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact." Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511 (3d Cir. 1994) (citation omitted).  However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (citations omitted).

Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)(emphasis in original).  "As to materiality, the substantive law will identify which facts are material." Id. at 248. A dispute is considered to be genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

## FACTUAL BACKGROUND:

This is an action brought by a former employee of the Pennsylvania Department of Public Welfare claiming that he was discriminated against because of his race and retaliated against for filing a PHRC complaint.   Plaintiff is an

4

African-American physician who was employed part-time from 1985 until his

retirement on September 26, 2003 at Harrisburg State Hospital, a mental health

facility operated by the Department.  Defendant Pennsylvania Department of

Public Welfare is an agency of the Commonwealth of Pennsylvania that was

responsible for the operation of the Harrisburg State Hospital at all times relevant

to the instant action.  Defendant Estelle Richman is and has been the Secretary of

Public Welfare since 2003.  Dr. Ann Shemo was the Medical Director at

Harrisburg State Hospital from March 2000 until September 2004.  She supervised

Plaintiff from March 2000 until he retired in September 2003. (Rec. Doc. 37, ¶¶1-

4).  The hospital closed on June 30, 2006.

Plaintiff filed a charge with the Pennsylvania Human Relations Commission

on February 14, 2001.  In that charge, he complains that the hospital changed his

work schedule.  On March 6, 2001, Plaintiff filed an amended charge with the

EEOC.  In that charge, he complained that he did not receive certain bonuses; that

he received less on-call time than other physicians; that the hospital threatened to

furlough him; that the hospital placed his mailbox in an isolated place and that his

work schedule had changed.  (Rec. Doc. 37, ¶¶4-6).  Defendants allege that the

Plaintiff never instructed the EEOC to cross-file the amended charge with the

PHRC, and there is no evidence that the claims were ever cross-filed.  (Rec. Doc.

37, ¶7).

Our recitation of the facts will now turn to a summary of various incidents relevant to our analysis which Plaintiff alleges were discriminatory.

On-Call Time Allocation

Defendants allege that since at least the mid 1980's, on-call time for physicians at Harrisburg State Hospital was prorated based on the number of hours worked by the physicians.  (Rec. Doc. 37, ¶8).  Plaintiff denies this allegation entirely.  Plaintiff alleges that from 1985 through 1999 there was an "institutional inability to obtain voluntary 'on call' coverage from time to time.  Thus initially (1985-1997) 'on call' demands were made on a 'voluntary' basis" and the part-time/full-time status had nothing to do with the process.  Plaintiff further alleges that he was not "invited" to participate in the process.  (Rec. Doc. 53, ¶9).

Defendants allege that Clayton began to receive on-call hours in July 1997, but about after a month after he began on-call, his hours began to decrease.  (Rec. Doc. 37, ¶¶9, 11-12).  Defendants allege that on-call time was briefly equalized between full-time and part-time physicians from August 23, 1999 to October 1999, after which it was reduced to 50% for part time doctors.  (Rec. Doc. 37, ¶14).  Dr. Davis and Dr. Nwokeji tried to accommodate Dr. Clayton's desire for more on-call time, but the physicians' union opposed the accommodation on the ground that a

greater share of the on-call hours should go to the full-time physicians.  (Rec. Doc.

37, ¶15). Defendants allege that thereafter, the hospital reinstated the earlier policy

of prorating on-call time based on whether the employee was full or part-time.

(Rec. Doc. 37, ¶17).

Furlough

In June 2000, Plaintiff was advised that he would be "bumped" out of his

position by another physician as a result of a furlough.    At the last minute, he was

advised that he would not be furloughed, and two other physicians, neither of

whom were African-American, were furloughed.  (Rec. Doc. 37, ¶¶ 19-22).

Mailbox Location

On July 25, 2000, Plaintiff's mailbox was moved to an isolated area for

about a month.  The mailbox was moved due to a theft of mail in the Eaton

Building, where his mailbox had been previously located.  Plaintiff was displeased

that his mailbox had not been moved to the Petry Building, where other doctors'

mailboxes were located.  After Plaintiff returned from an extended leave, he

discovered that all of the medical doctors' mailboxes had been moved to the

Administrative Building, where his new mailbox location was.  (Rec. Doc. 37,

¶¶25-28).

Change in Work Schedule

In the summer of 2000, the Health Care Financing Administration determined that Harrisburg State Hospital no longer met the requirements for participation as a provider in the Medicare program.  In response, the hospital management decided to implement a standardized hospital-wide program schedule, effective September 18, 2000.  Under the new schedule Plaintiff and other physicians were required to schedule their work between specified hours from 7:30 a.m. and 4:30 p.m.  The new schedule applied to all medical and psychiatric doctors, as well as social workers and management employees, including personnel staff. (Rec. Doc. 37, ¶¶ 29-35).

Missing Desk

Early in October 2001, Plaintiff discovered that one of the desks in his office was missing.  He later received a note that it had been removed to be restored and that it would not be returned to him.  Plaintiff talked to Dr. Montecalvo and was able to get the desk back.  Plaintiff testified that he had no evidence that the incident was racially motivated beyond his assertion that it was disrespectful. (Rec. Doc. 37, ¶¶ 41-45).

Office Location

In the fall of 2001, Superintendent Bruce Darney decided to move all of the physicians offices into the Vista Dome Building.  The building had just been air-

conditioned and Darney, for management purposes, wanted all the physicians in the same building.  When the doctors were moved, Plaintiff was originally assigned to share Room 217 with Phillip Grem, another part-time doctor.  An accommodation was made, however, to allow Dr. Grem to share the room with his wife, Judy Grem, who was also on the staff.  Plaintiff testified that Dr. Shemo told him that he could then have Room 207, which was a larger room, but then changed her mind and told him to take a room on the third floor.  Dr. Shemo testified that Room 207 had been allocated to psychiatric physicians, and she was not at liberty to give the room to Plaintiff.   Ultimately, Dr. Venbrux, a full-time Asian physician, from Thailand, was assigned Room 207.  Other physicians who were not African-American were also assigned to the third floor and were not given Room 207, including a white physician and two Asian physicians.  (Rec. Doc. 37, ¶¶46-52).

Board Certification Bonus, Fiscal Year 1999-2000

To be eligible for a specialty board certification payment, Management Directive 535.2 Amended required a doctor to be board certified by June 30 of a given year.  Under the directive, a doctor must submit evidence of his certification before June 30.  Plaintiff did not sit for the examination to become board certified until July 2000, and did not receive a bonus for 1999-2000 fiscal year.

Step Cash Payments

On January 6, 2001, Plaintiff became eligible for a step cash payment.

Plaintiff received a step cash payment in that year, however he did not receive one

in January 2002 or January 2003.  The record was reviewed and an inputting error

made on January 29, 2002 was discovered that had prevented the payment from

being made.  Both payments were subsequently made on September 26, 2003.

(Rec. Doc. 37, ¶¶58-60).

Grievances

On February 21, 2003, Plaintiff filed a grievance with the Department.

Barbara Casey, the designee of the Chief Executive Officer of the Hospital

responded on March 12, 2003.  Plaintiff filed another grievance on March 25,

2003.  The Chief Medical Officer of the Hospital responded to the grievance on

April 10, 2003.  (Rec. Doc. 37, ¶¶ 63-68)

**DISCUSSION**:

 I. Proper Parties

 A. Defendants Richman and Shemo

The Defendants argue that Defendants Richman and Shemo may not be held

liable under Title VII.  The Defendants further argue that Defendant Richman had

no personal involvement in any alleged violation of Section 1981 or the PHRA,

and therefore cannot be held liable under those statutes.  In the brief in opposition
to the Motion, Plaintiff concedes that Defendant Richman should be dismissed as a
party to this action due to her lack of personal involvement in the claimed
discriminatory action in this litigation.  Accordingly, Defendant Richman shall be
dismissed as a party.

Turning to Dr. Shemo, Defendants allege that she cannot be held liable for
an alleged Title VII violation.  Both parties concede that in general individual
employees may not be held liable for discrimination under Title VII.  See Sheridan
v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1077-78 (3d Cir. 1996)("we
are persuaded that Congress did not intend to hold individual employees liable
under Title VII").

However, in his brief, Plaintiff cites a Tenth Circuit case for the proposition
that an employee personally involved in discrimination could be held liable under
Title VII.  See Allen v. Denver Public School Bd., 928 F.2d 978 (10th Cir. 1991).
Our reading of this case indicates that it plainly does *not* stand for the proposition
which Plaintiff argues.  Allen does not hold that individuals may be sued under
Title VII, but rather that individual employees may be held liable under 42 U.S.C.
§ 1981.

The precedent in the Third Circuit is clear: individual employees cannot be

held liable for discrimination under Title VII.  See Kachmar v. Sungard Data

Systems, Inc., 109 F.3d 173, 184 (3d Cir. 1997).  Accordingly, Plaintiff's Title VII

claim against Defendant Shemo shall be dismissed.

      B.      Defendants Pennsylvania Department of Public Welfare and

Harrisburg State Hospital

Defendants argue that the named state entities, Pennsylvania Department of

Public Welfare and Harrisburg State Hospital, should be dismissed from Plaintiff's

§1981 brought pursuant to 42 U.S.C. § 1983 and PHRA claims, based on Eleventh

Amendment immunity.[1]

Pursuant to the Eleventh Amendment to the United States Constitution, the

States are generally immune from suits instituted against them by citizens.  See

U.S. Const. amend. XI.  However, a State can waive its immunity, see Alden v.

Maine, 527 U.S. 706, 755 (1999), or Congress may abrogate a States' immunity, so

long as it "both unequivocally intends to do so and acts pursuant to a valid grant of

constitutional authority."  Bd. of Trs. of the Univ. of Alabama v. Garrett, 531 U.S.

356, 363 (2001).

Defendants argue that Plaintiff's §1981 claims against it should be dismissed

---

[1] Pursuant to 71 Pa. Con. Stat. § 61, the Department of Public Welfare is a political subdivision of the Commonwealth.  As previously referenced, the Department is responsible for the operation of Harrisburg State Hospital.

because the Commonwealth has not waived its immunity and Congress has not

abrogated Eleventh Amendment immunity for §1981 claims.  The Supreme Court

has squarely held that 42 U.S.C. §1983 does not "override States' Eleventh

Amendment immunity."  Quern v. Jordan, 440 U.S. 332, 342 (1979).  Furthermore,

"neither a State or nor its officials acting in their official capacities are 'persons'

under §1983" and therefore States and state officials are immune from §1983

liability.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1988).

Precedent makes clear that Congress has not abrogated Eleventh

Amendment immunity for States or state officials who are sued for alleged §1981

violations.  Accordingly, because the Department and the Harrisburg State Hospital

are subdivisions of the Commonwealth of Pennsylvania, they are entitled to

immunity under the Eleventh Amendment to the United States Constitution and

Plaintiff's §1981 claims against those entities will be dismissed.

Pennsylvania courts have ruled that the PHRA waives the Commonwealth's

sovereign immunity, thus allowing the Commonwealth to be sued under that

statute in *state* court.  See Mansfield State College v. Kovich, 46 Pa. Cmwlth. 339

(1979).  However, pursuant to 42 Pa. Cons. Stat. § 8521(b), the Commonwealth

has specifically withheld its consent to federal suit.  The Supreme Court has

instructed that "[t]he test for determining whether a State has waived its immunity

from federal-court jurisdiction is a stringent one . . . Thus in order for a state statute

or constitutional provision to constitute a waiver of Eleventh Amendment

immunity, it must specify the State's intention to subject itself to suit in *federal*

*court*." Atascadero State Hospital v Scanlon, 473 U.S. 234, 241 (emphasis in

original).

It is therefore evident that the Commonwealth retains its immunity from suit

in federal court on PHRA claims, and accordingly, the Plaintiff's PHRA claims

against the Department and Harrisburg State Hospital will also be dismissed.

II.     Failure to Exhaust

Title VII Claims

Defendants argue that Plaintiff's Title VII claims of loss of bonuses and

constructive discharge are outside the scope of his administrative charge, and are,

therefore, barred.

Before filing a suit claiming violations of Title VII, a plaintiff must exhaust

his administrative remedies by filing a timely discrimination charge with the

EEOC.  Robinson v. Dalton, 107 F.3d 1018, 1020 (3d Cir. 1997).  A plaintiff's

Title VII claims are, thereafter, limited to claims that are within the scope of the

original administrative charge.  See Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir.

1996).  Exhaustion of administrative remedies promotes voluntary compliance

14

without litigation and gives notice to the charged party.  <u>See</u> <u>Reddinger v. Hosp.</u>

<u>Cent. Servs., Inc.</u>, 4 F. Supp.2d 405, 409 (E.D. Pa. 1998).

The test for determining whether a claimant has exhausted administrative

remedies is "whether the acts alleged in the subsequent suit are fairly within the

scope of the prior EEOC complaint, or the investigation arising therefrom."  <u>Antol</u>,

82 F.3d at 1295.  The determination "turns on whether there is a close nexus

between the facts supporting each claim or whether additional charges made in the

judicial complaint may fairly be considered explanations of the original charge or

growing out of it."  <u>Galvis v. HGO Servs.,</u> 49 F. Supp. 2d 445, 448-449 (E.D. Pa.

1999).  This test applies to new acts which occurred during the pendency of the

proceedings before the Commission.  <u>Anjelino v. New York Times, Co.</u>, 200 F.3d

73, 94 (3d Cir. 1999).

At the outset, we note that Plaintiff's March 6, 2001 EEOC charge

specifically referenced the fact that Plaintiff had not received bonuses in the past.

While Plaintiff may have alleged for the first time in his amended complaint in this

proceeding that he did not get a bonus for being Board Certified for Fiscal Year

1999-2000 or that he was denied step cash payments for 2002 and 2003, we find

that these allegations, inasmuch as they all relate to not receiving a type of

payment, may be considered "growing out of" what was initially charged in the

EEOC complaint and decline to dismiss them on failure to exhaust grounds.

Noting that a constructive discharge claim based upon hostile work environment must go beyond a standard hostile environment claim, we also must take into consideration that Plaintiff proceeded in a *pro se* capacity when he filed his initial and amended charges and we are inclined to construe the charges liberally.  We accordingly cannot find with certainty at this juncture that Plaintiff is foreclosed from asserting a constructive discharge claim based upon hostile work environment before this Court due to exhaustion grounds.   We shall analyze the merits of these claims later in this Memorandum.

PHRA Claims

Defendants argue that Plaintiff failed to present all but one of his state law claims under the PHRC to the state commission: Defendants concede that Plaintiff's change in work schedule claim was properly raised and therefore exhausted.

"To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the PHRC within 180 days of the alleged act of discrimination.  If a plaintiff fails to file a timely complaint with the PHRC, then he or she is precluded from judicial remedies under the PHRA."  Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997)(citing 43 Pa. Cons. Stat. §§ 959(a),

962),  cert. denied, 522 U.S. 914 (1997).  A plaintiff may satisfy his or her filing

requirement under the PHRA if the EEOC transmits the claim to the PHRC.  Id. at

926 n. 12.

As noted, the sole charge Plaintiff brought before the PHRC was his claim

of a change to his work schedule.   Defendants argue that the remainder of claims

that were asserted before the EEOC in the amended charge were never filed with

the PHRC because the Plaintiff never instructed the EEOC to cross file the claims,

and there is no evidence that the claims were ever cross-filed.  Defendants argue

that Plaintiff's failure to fully present his state law claims to the PHRC precludes

him from asserting them now.

Defendants further argue that despite the existence of a worksharing

agreement between the PHRC and the EEOC, Plaintiff's filing of the amended

charge with the EEOC does not satisfy the state exhaustion requirement.  The

Third Circuit reasoned in Woodson,

> [T]he worksharing agreement allows a plaintiff to proceed in court
> under Title VII without first filing with the PHRC.  That, however,
> does not mean that a plaintiff can initiate PHRC proceedings as
> required by the PHRA merely by filing with the EEOC.  Whether a
> plaintiff has initiated PHRC proceedings under the PHRA is a state
> law issue.  The worksharing agreement says nothing abut whether a
> plaintiff has invoked PHRC procedures if the PHRC has never
> received his or her claim, nor could it, given that the Pennsylvania
> Supreme Court held in Fye v. Central Transportation Inc., 487 Pa. 137
> (1979) that EEOC procedures are not a sufficient surrogate for PHRC

remedies.

109 F.3d at 926-27.

Plaintiff does not dispute outright that he did not cross-file his amended EEOC charge with the PHRC.  Instead, he argues that "the documentation from the EEOC reflects Dr. Clayton's efforts at filing more comprehensive charges.  For example, the March 16, 2001 notification from Maria Tomasso, EEOC District Director, acknowledges requests of dual filing of the charges in question with the EEOC and the Pa HRC . . ." (Rec. Doc. 53, ¶7).

However, our reading of the March 16, 2001 notification indicates that the EEOC had received the initial complaint filed with the PHRC, but does not, in any way, indicate that the EEOC had or was going to cross-file the amended charge of March 6, 2001 with the PHRC.  That the initial PHRC charge was filed with the EEOC does not mean that the amended EEOC charge was, as a matter of course, filed with the PHRC.  In fact, the lack of documentation indicates that no such cross-filing ever occurred.

Inasmuch as Plaintiff simply failed to exhaust any claims, other than his change in work schedule, before the PHRC, all of Plaintiff's other claims under the PHRA are barred based upon failure to exhaust and shall be dismissed.

III.    Individual Discrimination Claims

18

Existence of Adverse Employment Action

In order to establish claims for retaliation or discrimination under Title VII,

§1981 or the PHRA, an essential element for the plaintiff to establish is that he was

subject to an adverse employment action.  See Jones v. School Dist. of

Philadelphia, 198 F.3d 403-410-412 (3d Cir. 1999).[2]  In a discrimination case, the

Supreme Court has defined an adverse employment action as "[a] tangible

employment action constitut[ing] a significant change in employment status, such

as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits . . . A

tangible employment action in most cases inflicts direct economic harm."

Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761-62 (1998).  The Third

Circuit has defined an adverse employment action under Title VII as an "action by

an employer that is 'serious and tangible enough to alter an employee's

compensation, terms, conditions or privileges of employment.'" Storey v. Burns

Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004)(quoting Cardenas v. Massey,

269 F.3d 251, 263 (3d Cir. 2001)).

To establish an adverse employment action for a retaliation claim, a plaintiff

_____

[2] To establish a prima facie claim of employment discrimination, a plaintiff must
demonstrate that: (1) he is a member of a protected class, (2) that he was subject to an adverse
employment action, and (3) that similarly situated members of other racial classes were treated
more favorably. See Jones, 198 F.3d at 410-412.

must show that a "reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006)(quoting Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405, 2415 (2006)).   It is essential to a retaliation claim that Plaintiff establish a causal link between the protected activity and the subsequent adverse employment action.  Moore, 461 F.3d at 342.

It their brief, the Defendants discuss each of the incidents of alleged discrimination separately.  We shall analyze the merits of Defendants' arguments in turn.[3]

Allocation of On-Call Time

On this claim, Defendants argue that Plaintiff cannot meet the third prong of his prima facie case: that similarly situated members of other racial classes were treated more favorably than he was.  Defendants cite the deposition testimony of Dr. Davis, a white part-time physician to support their argument. Dr. Davis testified that he had never received equal on-call time to the full-time physicians

---

[3] In his brief, Plaintiff argues that piecemeal analysis of each claim is an inappropriate way to analyze a hostile environment claim.  We agree.  However, in this section of the Memorandum we are not analyzing Plaintiff's hostile work environment claim, but are analyzing his §1981 discrimination claims. Plaintiff's hostile work environment claim will be analyzed at a later point in this Memorandum.

and that on-call time was allocated on a prorated basis.

Plaintiff argues that Dr. Davis's testimony is not a full or accurate reflection of the on-call practices at the hospital.  Particularly, Plaintiff disputes that on-call time was always doled out on a prorated basis.  However, a review of the facts indicates that Plaintiff's failure to receive on-call time equal to a full-time physician was not based upon racial discrimination, but was due to Plaintiff's status as a part-time physician.  Put another way, Plaintiff's bald conclusion regarding the allocation of on-call time is wholly unsupported by the record.  It seems entirely logical to the Court, and well within the province of the Hospital, to reward full-time doctors with a larger number of on-call hours.  There is nothing discriminatory about this system, and furthermore, it was apparently applied equally to other part-time physicians who were not African American.

Plaintiff has not established that the Defendants on-call allocation system discriminated against him based upon his race and summary judgment will be granted in favor of the Defendants on this claim.

Threatened Furlough

Plaintiff alleges that he was discriminated against by being threatened with a furlough.  At the last minute, however, he was advised that he would not be furloughed.  Defendants argue that this claim must fail for two reasons: first

because Plaintiff was not, in fact, furloughed, and second because two other

physicians, neither of whom were African-American, were furloughed instead.

We agree with the Defendants' argument that Plaintiff did not suffer an

adverse employment action merely by being told he was going to be furloughed,

which he ultimately was not.  In no way can we construe the possibility of furlough

to be an adverse employment action.  Moreover, in light of the fact that other

individuals who were not African-American were furloughed in Plaintiff's place,

Plaintiff's discrimination claim with regard to this incident fails.  Summary

judgment will be entered in favor of the Defendants with respect to this claim

because Plaintiff suffered no adverse employment action.

Change in Work Schedule

Plaintiff alleges that changes in his work schedule were due either to

discrimination or retaliation for his complaining about on-call allocation and Dr.

Shemo.  (Rec. Doc. 3 at ¶¶ 34, 45).  Defendants argue that the changed work

schedule was predicated on the fact that in the summer of 2000, it was determined

that Harrisburg State Hospital no longer met the requirements for participating as a

Medicare provider and as a result, hospital management decided to implement a

standardized hospital-wide program schedule.

Defendants submit that under the new schedule, Plaintiff and other

physicians were required to schedule their work between 7:30 a.m to 4:30 p.m.,

although Plaintiff testified at his deposition that the hours were 8 a.m. to 4 p.m.

The new schedule applied to all medical and psychiatric doctors at the hospital and

also applied to all social workers and management employees including personnel

staff.  (Rec. Doc. 37, ¶¶ 29-36).  Based upon these factual assertions, which

Plaintiff does not dispute, it is clear that Plaintiff cannot show that similarly

situated members of other racial classes were treated more favorably than he was,

or that there was any discriminatory or retaliatory motive in instituting this hospital

wide policy.[4]  Accordingly, summary judgment will be granted in favor of the

Defendants on this claim.

<u>Location of Mailbox/Removal of Desk/Desired Office Location</u>

Plaintiff alleges that he was discriminated and/or retaliated against becuase

his mailbox was moved to a remote location, his desk was removed from his office

without notice and he was not given the desired office he wanted.  We find that

none of these claims constitute adverse employment actions.

---

[4] We take this opportunity to note that Plaintiff's submission entitled "Plaintiff's Response to Defendant's Statement of Undisputed Material Facts" (doc. 53) is <u>not</u> an appropriate submission to the Court.  Plaintiff does not properly admit or deny the Defendants' factual averments, but injects misplaced argument within a document that is designed for <u>factual</u> averments.  In effect, Plaintiff's misplaced arguments and failure to admit or deny facts to the Court has rendered this submission a practical nullity inasmuch as it  is entirely unhelpful and forces the Court to divine whether Plaintiff admits or denies certain facts.

As previously noted, Plaintiff's mailbox was moved from the Eaton Building to the Administrative Building following the theft of mail from the Eaton Building. At a point in time after Plaintiff's mailbox was moved to the Administrative Building, all of the other doctor's mailboxes were moved there as well. Plaintiff's desk was taken from his office to be refinished and then given to another physician without notice to him. Plaintiff ultimately received the desk back and there is no indication that the removal of the desk injured Plaintiff in any way. Plaintiff's room assignment in the Vista Dome building was clearly the subject of some juggling. Originally he had been assigned to share Room 217 with part-time physician Phillip Grem. An accommodation was made, however, to allow Dr. Grem to share the room with his wife Judy Grem, who was also on the Hospital staff. According to Plaintiff, Dr. Shemo then told him he could have Room 207, but then changed her mind and told him to take a room on the third floor. Dr. Venbrux, a full-time physician who is Asian, from Thailand, was ultimately assigned to Room 207. Although the room Plaintiff was finally assigned to was not as large as Room 207, there is no showing that it was insufficient for him to carry out his duties.

None of these incidents qualifies in any way as an adverse employment action. Rather, it appears to us that Plaintiff seeks to elevate rather *de minimis*

administrative decisions with which he disagreed to the status of measures that caused him real and cognizable harm.  Plaintiff's terms of employment were not altered because of these incidents and he suffered no resulting economic harm. Accordingly, Plaintiff's claims of discrimination regarding these incidents fail as a matter of law and summary judgment will be entered in favor of Defendants.

<u>Denial of Bonus for Board Certification FY 1999-2000</u>

Plaintiff alleges that he was wrongfully denied a bonus for his Board certification for fiscal year July 1, 1999-June 30, 2000.  Defendant argues that Plaintiff passed the exam in July, 2000, thereby rendering him ineligible for a 1999-2000 fiscal year bonus.

Defendant submits that the policy, according to Management Directive 535.2 Amended, a doctor must be board certified by June 30 of a given year to be eligible for a specialty board certification payment.  Under the directive, a doctor must submit evidence of his certification before *June 30th*.  Plaintiff admits that he did not sit for the examination until *July 2000*, therefore he did not and could not have submitted the necessary documents before June 30, 2000.

Plaintiff essentially argues that because he received his certification on July 14, 2000, the Hospital should have retroactively given him a bonus because the submission dates were a *"de minimus* issue." (Rec. Doc. 53 at 18).  Plaintiff

submits that "[w]hile the policy does suggest that evidence of certification needs to be mechanically submitted sometime between June 15 and June 30 of a particular fiscal year, no language deals with late submission and other language in the policy suggests that submission of certification may result in pro-ration of entitlement." (Rec. Doc. 53 at 18).

Despite Plaintiff's creative argument to the contrary, it is apparent that Dr. Clayton was ineligible for the certification payment for fiscal year 1999-2000 because he took the test and received the certification *after* the close of the fiscal year.  The fact that the directive does not provide for late submission of documents indicates to us that late submissions were clearly not accepted for this type of payment.  Accordingly, we cannot find that Plaintiff's failure to receive this bonus was an adverse employment action, because it was a result of his own making. Accordingly, summary judgment will be granted in favor of the Defendant on Plaintiff's claim for discrimination and/or retaliation based upon his failure to receive the aforementioned bonus.

<u>Untimely Receipt of Cash Payments for 2002 and 2003</u>

Plaintiff did not receive year-end bonuses for 2002 and 2003.  He was ultimately paid these bonuses, albeit late.  Defendants allege that the late payment was made due to an error, but was in no way motivated by racial animus or a desire

to retaliate.

Defendant submits that an inputting error in the bookkeeping system was made on January 29, 2002, which prevented the payment from being made to Plaintiff.  Both payments were subsequently made to Plaintiff on September 26, 2003.  Plaintiff alleges that the compensation was not paid to him until he had resigned from employment, and essentially that it was only paid to him because had resigned and complained.

However, as his allegations in this regard relate to the proper basis of a discrimination or retaliation claim, it appears that Plaintiff did not suffer from an adverse employment action because he was ultimately compensated, albeit in an untimely fashion.  Moreover, Plaintiff provides no evidence, once again other than his bald conclusion, in support of his claim that the late payment was the result of discrimination or retaliation.  Accordingly, we shall grant summary judgment in favor of the Defendants on this claim for discrimination and/or retaliation.

<u>Failure to Respond to Grievances</u>

Finally, Plaintiff claims that the Defendants discriminated against him for failing to respond to two grievances Plaintiff filed against Defendant Shemo.

Plaintiff filed his first grievance on February 21, 2003.  Barbara Casey, as the Chief Executive Officer's designee responded to the grievance on March 12,

2003.  Plaintiff submitted a second grievance on march 25, 2003.  The Chief

Medical Officer responded to that grievance on April 10, 2003.  The

Commonwealth responded to union appeals of the grievances.  The union then

elected not to take these matters to arbitration.  (Rec. Doc. 38 at 42).

It is apparent that the hospital management responded to the grievances and

Plaintiff's claim of discrimination and/or retaliation with regard to this incident has

no merit.  Summary judgment on this ground shall be granted in favor of the

Defendant on this claim.

IV.     Hostile Work Environment and Constructive Discharge Claim

Hostile Work Environment

In order to establish a hostile work environment claim under Title VII,

Plaintiff must show that (1) he suffered intentional discrimination because of his

race; (2) the discrimination was pervasive and regular; (3) it detrimentally affected

him; (4) it would detrimentally affected a reasonable person of the same protected

class in his position; and (5) there is a basis for vicarious liability.  See Aman v.

Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996).  A plaintiff must

show that the discrimination would have detrimentally affected a reasonable person

of the same race in his position.  Aman, 85 F.3d at 1081.  In considering whether

the objective test is met, the court should "consider all the circumstances,"

28

including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 23 (1993); <u>see also</u> <u>Abramson v. William Patterson College of New Jersey</u>, 260 F.3d 265, 280 (3d Cir. 2001).

In support of this claim, Plaintiff asserts that: 1) he was denied equal on-call time in October 1999; 2) he was told he would be furloughed as of June 23, 2000(although he ultimately was not); 3) his mailbox was moved in July 2000; 4) his work schedule was changed in September, 2000; 5) his desk temporarily taken from him in October 2001; 6) he did not receive the office he desired in the Vista Dome building in November 2001; 7) in February and March 2003 he was dissatisfied with the grievance responses from the Hospital management; and 8) he learned did not receive his step cash payments in September 2003.

Defendants argue that Plaintiff's hostile work environment claim must necessarily fail because Plaintiff has not proven that the alleged discriminatory conduct was pervasive or regular.  Defendants argue further that there is no evidence that any of the alleged incidents were racially motivated.

We agree with the Defendants' submitted argument.  A review of the time-line of these incidents alone demonstrates that they occurred rather sporadically

29

over a period of years. The first act with which Plaintiff took issue, the allocation of on-time call, occurred in 1997 and 1999. The next acts, the potential furlough, moved mailbox and change in work schedule occurred in 2000. In 2001, Plaintiff complains of a temporarily missing desk and that he did not receive desired office space. Finally, in 2003 Plaintiff asserts that he was dissatisfied by the grievance system and was denied step cash payments, which he ultimately received. The incidents did not persist at a level that is the hallmark of a hostile work environment. The Defendant was not subjected to a constant barrage of threats or remarks, nor is there any indication that his race was a contributing factor in *any* of the conduct to which he takes offense. See Hanani v. N.J. Dep't of Envtl. Prot., 2006 U.S. App. LEXIS 27960, *22 (3d Cir. 2006)(An Egyptian-born employee did not establish that the alleged discriminatory conduct was severe or pervasive to establish a claim for hostile work environment). Furthermore, the Defendant was not threatened or humiliated in a physical or emotional manner, and there is absolutely no showing that Plaintiff's work performance was interfered with based upon the alleged incidents.

Accordingly, because we find that the Plaintiff cannot establish that the alleged incidents were severe or pervasive, or that the incidents were objectively detrimental to a reasonable person similarly situated to Plaintiff, or to Plaintiff

himself, we shall grant summary judgment in favor of the Defendants on Plaintiff's hostile work environment claims.

Constructive Discharge Claim

To sustain a constructive discharge claim, a plaintiff must prove that his employer knowingly engaged in conduct which foreseeably resulted in working conditions so intolerable or unpleasant that a reasonable person in the employee's position would resign.  See Durham Life Ins. Co. v. Evans, 165 F.3d 139, 155 (3d Cir. 1999); Aman, 85 F.3d at 1085.  Summary judgment is appropriate if a trier of fact could not reasonably conclude that a reasonable person in the plaintiff's shoes would have felt compelled to resign.  Hopson v. Dollar Bank, 994 F.Supp. 332, 340 (W.D. Pa. 1997).

As discussed above, Plaintiff has not established that he was subjected to a hostile work environment, and as a necessary corollary, he cannot establish that his working conditions were so intolerable or unpleasant that he was forced to resign. The incidents Plaintiff complains of were not pervasive, but were dispersed throughout a period of years.  Furthermore, Plaintiff does not show that *any* of the alleged conduct was directed at him based upon his race.

Plaintiff simply has not borne his burden of establishing a constructive discharge claim, and accordingly, summary judgment will be entered against him

on this claim.

V.      Statute of Limitations

Even assuming *arguendo* that Plaintiff's discrimination claims contained

any merit, for the reasons that follow a majority of the claims necessarily fail

because they are barred by the applicable statute of limitations.

Title VII Claim of Discrimination Based on On-Call Policy

Defendants allege that Plaintiff's Title VII claim of discrimination by

Defendants' policy for the allocation of on-call is barred by the statute of

limitations.

The limitations period for a Title VII claim begins to run, under federal law,

"when the plaintiff knows or reasonably should know that the discriminatory act

has occurred." Uohemeng v. Delaware State College, 643 F. Supp. 1575, 1580 (D.

Del. 1986)(quoting McWilliams v. Escambia County School Board, 658 F.3d 326,

330 (5th Cir. 1981)).   In a deferral state, such as Pennsylvania, a plaintiff is

required to file a Title VII or ADEA charge of discrimination with the EEOC

within 300 days of the alleged unlawful practice. See 42 U.S.C. §2000e-5(e)(1);

29 U.S.C. § 626(d)(2); see also Watson v. Eastman Kodak Co., 235 F.3d 851, 854

(3d Cir. 2000).

Defendants allege that Plaintiff's limitation period for his on-call claims

began to run in August or September 1997, when Plaintiff was aware that his on-call time was being reduced.  Defendants argue that because Plaintiff's charge was not filed with the EEOC until March 2001, and his §1981 claim was not filed until April 2005, both claims were initiated long after the expiration of the statutory period.  Defendants further argue that even if we determine that Plaintiff's claim of discrimination regarding on-call time allocation accrued in October 1999, when, after a brief period beginning August 23, 1999, the on-call time was equalized, Plaintiff's percentage was again reduced to 50 per cent, it is barred by the applicable limitations period, because in that case the Title VII period would have expired in June 2000.

Plaintiff admits that he alleged some conduct falling outside the applicable 300-day federal tolling time frame.  Plaintiff argues, however, that the continuing violation theory is applicable to this Title VII claim, and therefore the claim is not time-barred.  Under the continuing violation theory, a plaintiff may pursue claims for discriminatory conduct that is time-barred if he or she can demonstrate that the act is part of an ongoing practice or pattern of discrimination by the defendant.  See Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir. 1997).  When determining whether there is a continuing pattern of discrimination, the Third Circuit has held that a court should consider the subject matter, frequency and

permanence of the discrimination:

> The first is subject matter.  Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation?  The second is frequency.  Are the alleged acts recurring . . . or more in the nature of an isolated work assignment or employment decision?  The third factor, perhaps of most importance, is degree of permanence.  Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate.

Rush, 113 F.3d at 482 (citation omitted).

Taking the record as a whole, we do not find that Plaintiff has proffered enough evidence to establish a continuing violation theory.  Plaintiff attempts to conflate what he considers to be discrimination in on-call time allocation with other isolated incidents for which he is aggrieved, including the moving of his mailbox, temporary removal of his desk, and failure to receive desired office space.  Other than the fact that Plaintiff was offended by these incidents, we can find no obvious link or commonality connecting them to a degree where a pattern is discernable.  Furthermore, the incidents which Plaintiff alleges to be discriminatory in nature did not occur in a regular fashion, but were isolated incidents scattered throughout a period of years.  There is plainly no showing that the incidents were systematic or occurred with even the slightest degree of frequency.  We simply do not find that Plaintiff can avail himself of the continuing violation theory with

regard to his Title VII claim for discrimination in on-call time allotment.

Therefore, as Defendants submit, even using the *later* of the two dates when Plaintiff was aggrieved over on-call allocation as a measuring stick, the statute of limitations would have run in June of 2000.  Accordingly, because Plaintiff's claim was not made until 2001, it is barred by the statute of limitations and summary judgment will be entered in favor of the Defendant.

§1981 Claims

The original version of the statute presently codified at 42 U.S.C. § 1981 was enacted as §1 of the Civil Rights Act of 1866.  It was amended in minor respects in 1870 and recodified in 1874, but its basic coverage did not change prior to 1991.  Initially the statute served to protect the rights of blacks Americans to "make and enforce contracts" with the same freedom and ability as white Americans.  However, in 1991, Congress amended the statute defining the term "make and enforce contracts" to include the "termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  Therefore, after the 1991 amendments were added, §1981 had, in essence, more "teeth" and provided more causes of action to individuals subjected to various forms of racial discrimination.  See Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 372-373 (2004).

However, in December 1990, Congress enacted 28 U.S.C. § 1658, which created a four year catch-all statute of limitations for federal civil actions.  In Jones, the Supreme Court held that §1658 applied to §1981 claims.  Accordingly, §1981 claims are subject to a four year statute of limitations.[5]

Defendants argue that each of the ten incidents of discrimination alleged by Plaintiff in his amended complaint are barred by the statute of limitations applied to §1981 claims brought via §1983.   The Defendants, however, relied on the two year statute of limitation that was effective prior to Jones.  Our review of the claims indicates that some, but not all, are barred by the four year statute of limitations applied to federal civil actions pursuant to §1658.

This action was commenced by Plaintiff on April 15, 2005.  Accordingly, all claims accruing prior to April 15, 2001 are time-barred.  Plaintiff was "threatened" with furlough in June 2000, and therefore the limitations period ran in June 2004 on this claim.  Plaintiff's work schedule was changed pursuant to a policy effective September 18, 2000, and accordingly the limitations period on this claim ran in September 2004.  Plaintiff discovered that he did not receive a bonus for fiscal year 1999-2000 in July 2000, therefore the statute of limitations on this claim ran in

---

[5] Prior to the 1991 amendments to §1981, the statute of limitations applied to §1981 claims was borrowed from the statute of limitations for personal injury actions in the state where the alleged violations occurred. The Pennsylvania statute of limitations for personal injury actions is 2 years from the date of accrual.

July 2004.   Finally, Plaintiff's mailbox was moved to the Administrative Building on July 25, 2000, and this claim therefore became time-barred on July 25, 2004.

Plaintiff's remaining claims: that his desk was removed without notice from his office in October 2001, he did not receive the office he desired in the Vista Dome building in November 2001, that he was denied step cash payments for 2002 and 2003, and that he was dissatisfied by the grievance process in 2003 are not barred by the four year statute of limitations pursuant to §1658.   However, Plaintiff's discrimination claims for these incidents necessarily fail for the reasons described hereinabove.

**CONCLUSION**:

Accordingly, for the detailed reasons set forth in this Memorandum, we shall grant the Defendant's Motion for Summary Judgment.  An appropriate Order shall issue.

s/ John E. Jones III
John E. Jones III
United States District Judge